UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TRAVIS DELANEY WILLIAMS,

                    Plaintiff,

        v.                                    Case No. 14-cv-1078-pp

DAVID STAUCHE, MAXWELL ISAAC,
ALVIN BURDICK, MEGAN KEEFER, and
GUARD RAY,[1]

                    Defendants.

**DECISION AND ORDER GRANTING THE KENOSHA DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 57), GRANTING
DEFENDANT MEGAN KEEFER'S RENEWED MOTION FOR
SUMMARY JUDGMENT (DKT. NO. 133), AND DISMISSING CASE**

This order resolves the joint motion for summary judgment filed by

defendants David Stauche, Maxwell Isaac, Alvin Burdick, and "Guard Ray,"

dkt. no. 57, and defendant Megan Keefer's renewed motion for summary

judgment, dkt. no. 133.

**I.      Procedural Background**

In its June 4, 2015 order screening the plaintiff's complaint, the court

concluded that the plaintiff was making two kinds of constitutional claims.

Dkt. No. 13 at 7. First, he appeared to be claiming that two Kenosha County

Jail guards subjected him to excessive force, and were indifferent to his serious

medical needs. Id. Second, it appeared that the plaintiff was alleging that other

---

[1] The court updated the caption and the docket to reflect the correct spellings
for the names of defendants David Stauche, Maxwell Isaac, and Alvin Burdick.

Kenosha County guards, as well as a nurse there, had been deliberately indifferent to the plaintiff's serious medical needs. Id. at 8. The court allowed the plaintiff to proceed on those claims as to defendants Stauche, Isaac, Burdick and "Guard Ray," all guards at the Kenosha County Jail ("the Kenosha defendants"). The court also allowed him to proceed on his claim against the nurse, Megan Keefer. Id.

Defendant Keefer filed her original motion for summary judgment on December 14, 2015, before she had access to the plaintiff's medical records. Dkt. No. 48. Keefer later obtained the plaintiff's medical records, and filed a renewed motion for summary judgment. Dkt. No. 133. Consequently, the court denied the December 2015 motion without prejudice on February 21, 2017. Dkt. No. 151. In coming to its decision, the court has considered the documents supporting Keefer's original motion for summary judgment, dkt. nos. 49-51, the plaintiff's sworn response, dkt. no. 54, and Keefer's original reply brief, dkt. no. 71. The court also has reviewed Keefer's renewed motion, dkt. no. 133, the plaintiff's response materials, dkt. nos. 139-144, and Keefer's final reply brief, dkt. no. 147.

The Kenosha defendants filed their motion for summary judgment, along with supporting documents and evidence, on January 4, 2016. Dkt. Nos. 57-70. In an order entered March 14, 2016, the court directed the plaintiff to respond to this motion on or before May 16, 2016. Dkt. No. 78. The court received the plaintiff's response briefs, declarations, and proposed findings of fact on March 24, 2016. Dkt. Nos. 81-88. Several of these documents,

including the plaintiff's sixty-page brief, reference 28 U.S.C. §1746, which gives evidentiary weight to the factual assertions they contain. After requesting an extension of time, the Kenosha defendants filed reply materials on April 20, 2016. Dkt. Nos. 96-105. The plaintiff then submitted surreply materials, dkt. no. 110, which the court agreed in its January 9, 2017 order to consider when evaluating the motion for summary judgment, dkt. no. 148.

## II.  RELEVANT FACTS[2]

On August 18, 2014, the plaintiff was transferred from the Racine County Jail to the Kenosha County Jail (Jail) for a court appearance scheduled to take place on August 19, 2014. Dkt. No. 68 at ¶9. The next day, after his court appearance, the plaintiff was transferred back to the Racine County Jail. Dkt. No. 49 at ¶3. The events alleged in the complaint took place during those two days.

### A.  Booking

Defendant Dave Stauche participated in booking the plaintiff into the Jail on August 18, 2014. Stauche indicates that when the plaintiff arrived in booking, he had with him ACE bandages and compression socks, the kind of

---

[2] The court takes the facts from the defendants' proposed findings of fact of the defendants, to the extent they are supported by admissible evidence. Dkt. Nos. 49, 68. The court also takes facts from the plaintiff's sworn submissions, including his briefs in opposition to the defendants' motions for summary judgment, dkt. nos. 54, 81, and his response to the defendants' proposed findings of fact, dkt. no. 88. The court also has viewed a DVD that contains excerpts from the August 18, 2014 surveillance footage taken by the Jail's video cameras. Dkt. No. 70. The plaintiff suggests that the defendants cherry-picked the video clips, dkt. No. 81 at 11, but provided no proof supporting that claim, so the court has considered the images. The court has noted disputes of fact.

"medical equipment" that had to be approved before an inmate could keep it. Dkt. No. 61 ¶3. Stauche says that his "practice" was to contact the medical department to ask about the status of approval for such equipment; he says he informed the plaintiff that the plaintiff could not keep his ACE bandages and compression socks with him, because they had not been approved. Id. In contrast, the plaintiff says that Stauche never contacted the medical department, and that there was no policy requiring approval for such equipment. Dkt. No. 74 at 1. The plaintiff says that he chose to give up his knee wraps, because he did not want to spend the next twenty-four hours in a holding cell, which is what Stauche told him would happen if he did not give up the wraps. Dkt. No. 81 at 4.

The defendants assert that inmates are "informed of the procedures to access medical care" at the time of booking. Dkt. No. 68 at ¶12. The plaintiff disputes that "at the time of booking," inmates "are informed of the procedures to access medical care." Dkt. No. 81 at 3. The defendants state that "[j]ail rules and procedures . . . are posted in every housing unit of the Jail." Dkt. No. 68 at ¶12. The plaintiff contends that jail rules and procedures were not posted in his housing unit between July 2013 and August 2014. Dkt. No. 81 at 3.

After booking, the plaintiff was housed in Medical Ward 2, Bunk 5. Dkt. No. 68 at ¶18.

B.    Transport to X-Block

At approximately 2:05 p.m., defendant Isaac received a telephone call from Nurse Autumn in the Health Services Unit (HSU). Id. at ¶18. Autumn told

Isaac that the plaintiff was not approved to have a wheelchair in the housing unit; she said that the plaintiff was permitted a wheelchair only for long distances. Id. The plaintiff disputes that Isaac got a phone call from a nurse, dkt. no. 81 at 4, but the defendants submitted (as an exhibit to the affidavit of Marc Levin, the detentions commander for the jail) a video that shows Isaac on the telephone, dkt. no. 70 at clip 14E5798, and an e-mail from Nurse Autumn indicates that she had talked to a nurse at the Racine County Jail and confirmed that the plaintiff only needed a wheelchair for long distances, dkt. no. 101-1.

Isaac indicates that after the call, Isaac informed the plaintiff that he would have to give up his wheelchair because it was not permitted by HSU, but the plaintiff said he could not walk without it. Dkt. No. 68 at ¶19. The plaintiff refused to give up his wheelchair unless he could get his "wraps" back. Id. at ¶¶19-22. When the plaintiff continued to refuse, Isaac ordered the plaintiff "to pack his property for movement to X-Block." Id. at ¶23. The plaintiff says he had no property to pack. Dkt. No. 81 at 5. The plaintiff also believes that Isaac made him give up his wheelchair in retaliation for the plaintiff's persistent and consistent requests for his ACE bandages and bedding. Id. at 4.

Isaac radioed for additional officers to help him transport the plaintiff to X-Block. Dkt. No. 68 at ¶24. The plaintiff says Isaac never used his radio and that he used his phone instead, dkt. no. 81 at 5, but the video shows Isaac using the radio attached to his shirt, then making a telephone call, dkt. no. 70 at clip 14E5798.

5

Officers Stauche and Mottinger arrived to assist with the transport. Dkt. No. 68 at ¶24. Isaac placed handcuffs on the plaintiff, id. at ¶25; the plaintiff says they were so tight that they instantly caused pain to both his wrists. Dkt. No. 88, ¶25.

According to the defendants, the plaintiff repeatedly attempted to impede progress by wrapping his feet around the bunks or by putting his feet on the ground in order to prevent the wheelchair from moving forward. Dkt. No. 68 at ¶¶26, 32-33. The defendants also aver that the plaintiff yelled disrespectful statements and made threats to officers during transport. Id. at ¶¶33-34.

In contrast, the plaintiff says that Isaac pushed the wheelchair into two beds, a table, four doors and a door frame. Dkt. No. 88 at ¶26; dkt. no. 86 at ¶¶28-32, 34. He also says the wheelchair had no footrest and his legs were not strong enough to hold his feet up or wrap around anything. Dkt. No. 88 at ¶26. According to the plaintiff, Isaac rammed the plaintiff into numerous objects and injured the plaintiff, and tried to dump the plaintiff out of the wheelchair. Dkt. No. 86 at ¶39, dkt. no. 88 at ¶31.

Although the video does not show the approximately one minute that the officers were in the medical ward getting the plaintiff into the wheelchair, various cameras follow the group's progress through the hallways from the medical ward to X-Block. Dkt. No. 70 at clips 14E5802, 14E5804, 14E5807, 14E5811, 14E5813, 14E5816, 14E5818, 14E5821, 14E5824, 14E5827 and 14E5831. The video does not have sound, and consists of still images taken approximately every six seconds. In the video, the plaintiff sits passively in the

wheelchair with his feet on the floor and his hands in his lap. There are no signs that the plaintiff was wrapping his feet around things. Nor are there any signs that the plaintiff was in distress. In contrast to the plaintiff's claims that Isaac rammed him into beds and a table, the video clips show no beds or tables; nowhere on the clips does the wheelchair come into contact with anything other than the floor as it moves along.

C.    Transfer to Cell

According to the defendants, once they were outside the "Zone 5 entrance to X-Block," Isaac ordered the plaintiff to stand up and walk to the cell, but the plaintiff said that he could not walk without assistance. Dkt. No. 68 at ¶35. Isaac and Stauche assisted the plaintiff by holding him under his arms while he walked to the cell. Id. at ¶36. They got the plaintiff into his bunk without incident, and Officer Mottinger removed the handcuffs, while Isaac aimed his OC spray at the plaintiff due to the threats the plaintiff had made during transport. Id. at ¶¶37-38. The officers then left the cell, while the plaintiff continued to yell threats and disrespectful statements. Id. at ¶39.

In the plaintiff's version of events, he was not making threats, but asking and shouting for help. Dkt. No. 88 at ¶34. He says that Isaac never ordered the plaintiff to walk. Id. at ¶35. Instead, Isaac snatched the plaintiff out of the wheelchair, slammed the plaintiff into a wall and searched him. Id. The plaintiff says he was dragged down the hall, id., and that Isaac and Stauche had full control of his body, dkt. No. 81 at 6. Next, the plaintiff avers that Isaac threw

7

the plaintiff to the floor and sat on him while pointing his OC spray at the plaintiff and calling him a bitch. Id.

Clip number 14E5833 of the video shows the plaintiff in the hallway, hunched over but with his feet on the ground, and with one officer holding each of his arms. The video does not show anyone slamming the plaintiff into a wall, or dragging him down the hall; the wheelchair is parked in front of the door to the cell. The two officers went in the cell for approximately thirty seconds; during that time, they (and the plaintiff) were out of view of the video camera. A third officer stood at the door while the first two were inside with the plaintiff.

None of the officers present—Isaac, Stauche or Mottinger—observed any injury to the plaintiff, or saw that he was in need of emergency medical care. Dkt. No. 68 at ¶43. They indicate that they would have directed the plaintiff to fill out an "Inmate Medical Request Form" if he had requested non-emergency care. Id. at ¶44. They stated that the plaintiff never requested medical attention or an inmate medical request form from Isaac, Stauche or Mottinger. Id. at ¶45.

According to the plaintiff, the defendants did not observe his injuries because they didn't want to. Dkt. No. 81 at 7. He states that they ignored his cries for medical help during the whole trip from the medical ward to the X-Block (although he says a different officer came from another zone in response to his cries). Dkt. No. 81 at 7. The plaintiff states that he did not know he needed to fill out a medical request form, because "he had just been assaulted

by an officer and [was] bleeding [with] skin hanging from the cuts;" he assumed that this would have appeared to the officers to be a medical emergency. Id.

D.    Flooding

Shortly after the officers left the plaintiff in his cell in X-block, the video shows water start to seep out from under the plaintiff's cell door. Dkt. No. 70 at clip 14E5836. In contrast to the short clips that tracked the trip from the medical ward to the X-Block, this clip is forty-two minutes long. It is clear that the water was coming from only one cell—the plaintiff's. The clip shows the water increase from a trickle to a flow, filling the hallway outside the cell and traveling away from the camera. The water passed three neighboring cells, moved into another section of the hallway, and eventually traveled as far as six cell doors down the hall.

Approximately twenty minutes later, defendant Officer Alvin Burdick entered X-Block and noticed water coming from the plaintiff's cell. Dkt. No. 68 at ¶46. The video shows Burdick approach the plaintiff's cell, stand in the hallway and talk to the plaintiff for approximately thirty seconds. Dkt. No. 70 at clip 14E5836. He appears calm and, in the time-lapsed images, looks forward, turns his head to face the cell door, and then looks forward again before he leaves the frame.

Burdick and the plaintiff describe this interaction very differently. According to Burdick, he asked the plaintiff why he was flooding his cell, and the plaintiff started yelling at Burdick, stating that he wanted a nurse and that "he should not be in there." Dkt. No. 68 at ¶47. Burdick tried to explain to the

plaintiff that flooding his cell would not get the nurse over to see him, and the plaintiff responded, "I don't care bitch." Id. at ¶48. Burdick asked another officer to retrieve the pipe chase key and turn the water off until maintenance could shut it off. Id. at ¶49. Burdick grabbed a couple of dirty sheets and blankets to put in front of the plaintiff's door to try to stop the water from coming out. Id. at ¶51. The plaintiff called Burdick a "bitch" and began making threats, while Burdick ignored the plaintiff and monitored the inmate workers who were cleaning up the water. Id. at ¶¶52-55. Burdick indicates that he did not observe an emergency situation requiring emergency medical attention, and that the plaintiff never requested an inmate medical request form from Burdick. Id. at ¶¶56, 58. When Burdick asked the plaintiff about the nature of his alleged medical emergency, the plaintiff refused to respond to the question or explain why he needed emergency medical attention. Id. at ¶57. Instead, he continued to yell and make threats to Burdick. Id.

The plaintiff alleges that when the plaintiffs in the X-Block saw Isaac sitting on the plaintiff, pointing the OC spray can at him and calling him names, they became so enraged that they started kicking and banging on their doors, trying to get the attention of other jail staff. Dkt. No. 1 at 5. He alleges that when the inmates couldn't get staff attention that way, they "started flooding [their] cells." Id. The plaintiff disputes Burdick's assertion that Burdick saw water coming out of *his* cell. Dkt. No. 81 at 7.

The plaintiff says that when Burdick asked him what was wrong, the plaintiff clearly and concisely told Burdick that he needed medical attention

because an officer he did not know has just tried to break his legs and knee caps by pushing the plaintiff's wheelchair into beds, a table, door frames, and a door. Id. at 8. The plaintiff reported that he had several long cuts and two punctures that were caused by the beds. Id. The plaintiff asked to have the wounds cleaned and the hanging skin removed; he also wanted a tetanus shot. Id. The plaintiff says Burdick responded by saying that "no one gives a fuck," and told the plaintiff several minutes later, "I hope you die in that cell." Id. at 8-9. The plaintiff avers that he did not make any threats to Burdick, and did not say "I don't care bitch." Id. at 8. The plaintiff says he was never excited and that he was calm and matter-of-fact at all times during two conversations with Burdick. Id. at 9.

The video shows that the clean-up process was extensive. Various correctional officers came in and out of the area; some talked to the plaintiff through the door to his cell, others did not. Some talk to inmates in other cells through their doors; some do not. The clean-up efforts start with Burdick putting the sheets and blankets in front of the door; the fabric becomes soaked, and the sheets and blankets sink beneath the water to the floor. An officer (perhaps Burdick) then brings a squeegee with a long handle; after a few moments, he appears to realize that the squeegee is useless given the amount of water. Eventually, inmates in what appear to be black-and-white-striped prison garb appear, along with an officer who brings what looks like a large wet/dry vacuum. Some of the inmates have squeegees; an officer brings more

fabric. It takes some time for all of these various individuals to clear the hallway of water.

After the officers and inmates had cleared the hallway of most of the water, officers came to the plaintiff's cell and spoke with him through the door. Dkt. No. 70 at clip 14E5838. An officer approaches the door and opens the trap, presumably to place handcuffs on the plaintiff. The cell door is then opened, and the plaintiff backs out with his hands cuffed behind his back. The plaintiff stands in the hall, facing the wall, with a dark-haired, bearded officer holding his arm for just under six minutes. (This officer, as far as the court can tell, had not appeared in any of the video footage up to this point.) Other officers go inside the cell, out of camera range. Several times while the bearded officer stood in the hallway with the plaintiff, the plaintiff turned his head and spoke over his shoulder toward the officer. At times, he was talking with his head back and his eyes closed, or had an angry expression on his face. For the most part, the bearded officer either is watching what is going on in the cell (presumably the clean-up of the water inside), or speaking with the inmate in the cell behind him. The officers in the cell eventually come out, and walk the plaintiff back into the cell. One of them removes his cuffs through the trap door, and all of the officers leave.

An officer named Steven Rea submitted an affidavit, attesting to the fact that he held onto the plaintiff's arm for his own safety and for the safety of the other officers and inmates. Dkt. No. 103 at¶3. Rea avers that he was not aware of any injuries to the plaintiff, and does not recall the plaintiff asking for

medical attention or being in any type of medical distress. Id. at ¶4. The video

shows that the plaintiff stood in the hallway, unassisted other than Rea's hand

at his elbow, facing the wall, for approximately six minutes before being

returned to his cell. Dkt. No. 70.

Officer Rea may be "Guard Ray," whom the plaintiff alleges helped

transport him from the medical ward to X-Block. Dkt. No. 88 at ¶27. The

plaintiff averred that two other inmates identified the officer who helped with

the transport (identified in the brief as Officer Mottinger) as "Rhea pronounced

'R-A-Y.'" Dkt. No. 81 at 5. Rea, in contrast, attests that he did not assist in the

transport of the plaintiff from the medical ward to X-Block. Dkt. No. 103 at ¶3.

Isaac (Dkt. No. 97 at ¶8) and Stauche (Dkt. No. 98 at ¶7) also deny that Rea

was involved in the transport. As indicated above, Rea had dark hair and a

beard; no one matching that description appeared in the video clips of the

wheelchair trip from the medical ward to the X-Block.

E.    August 19, 2014

On August 19, 2014, Isaac was a movement officer, which means it was

"his responsibility to escort inmates to the Intake/Booking area where they

would be signed out and then escorted to a vehicle in the Sally Port by the

Transporting Deputy." Dkt. No. 68 at ¶65. Isaac transported the plaintiff to

booking. Dkt. No. 88 at ¶66. The plaintiff says before Isaac took him to

booking, Isaac threw bedding in his face, and told another Rea to find a spit

mask. Id. at 65. The plaintiff says that during the trip to booking, Isaac pushed

the plaintiff into the wall and hit his legs while the plaintiff sat in the

wheelchair. Id. at ¶66. The plaintiff alleges that Isaac told a deputy whose name the plaintiff did not know that the plaintiff had no property, even though Isaac had "seen" [the] ACE bandages in Zone 12 desk drawer." Id. at ¶67. The plaintiff alleges that Isaac again ignored the plaintiff's medical request, and that the "transporting deputy" said he would notify the Racine County Jail "of the incidents and the missing ACE wraps before [they got to Racine County Jail]." Id. at ¶68. Isaac, on the other hand, says that he never threw anything at the plaintiff, and that he would never intentionally push an inmate's wheelchair into a wall or ram an inmate's legs into the wall. Dkt. No. 68 at ¶¶65-66. He stated that he would release whatever property was in the inmate's property bag in intake, that he played no role in taking the ACE bandages from the plaintiff, and that he did not know where the plaintiff's ACE bandages were located. Id. at ¶67. Isaac states that he did not see that the plaintiff "was in any medical distress or in need of any medical attention on August 19, 2014." Id. at ¶68.

F.    Medical Treatment

As part of the booking process at the Jail on August 18, 2014, a Medical/Mental Screening Questionnaire "was completed" for the plaintiff. Dkt. No. 49 at ¶7. The questionnaire indicated that the plaintiff "did not have any physical or behavioral conditions," id. at ¶8, or any injury that required medical attention, id. at ¶12. A "Medical Questionnaire" also "was completed;" it listed the medications that Racine County Jail Dr. Ortiz had prescribed, noted that the plaintiff wore glasses, and that indicated that the plaintiff had

14

reported that "he had hip problems, knee surgeries, and heel spurs." <u>Id.</u> at ¶11.

"Health Transfer Summaries" also "were completed" on both August 18 and

August 19, 2014; neither indicated that the plaintiff "sustained any injury

while at the" Jail. <u>Id.</u> at ¶¶ 19-20.

The plaintiff indicates in his brief that when he spoke with other inmates

at the Jail, he learned that he could possibly get his ACE bandages back. Dkt.

No. 81 at 7. He says that is why he filled out an inmate medical request on

August 18, 2014. <u>Id.</u> In contrast, the defendants indicate that the August 18,

2014 Inmate Medical Request Form asked the Jail's Medical Department to

"evaluate his 'walking conditions,'" dkt. no. 49 at ¶13, "rather than rely upon

the Racine County Jail's assessment because he was suing the Racine County

Jail's entire Medical Department for inadequate care, <u>id.</u> at ¶14. The

defendants state that the plaintiff's Medical Request Form "did not mention any

acute condition or injury." <u>Id.</u> at ¶15.

Jail staff responded to the Medical Request Form on August 19, 2014. <u>Id.</u>

at ¶17. They told the plaintiff that he "would be placed on the next available

sick call," but as it turned out, the plaintiff left the Jail that same day, "before

he was seen in sick call." <u>Id.</u> at ¶18.

In his complaint, the plaintiff alleged that he asked Stauche, Burdick,

Rea and "Nurse Megan" (defendant Keefer) for medical help and dry clothing on

August 18, 2014, but that he "was denied." Dkt. No. 1 at 6. In his brief

opposing defendant Keefer's motion for summary judgment, the plaintiff says

that he told Keefer how his "injury occurred and she did nothing but walk away

after she seen the blood on [his] legs and pants and the cuts." Dkt. No. 54 at 7. He wrote, "Nurse Megan seen the injuries and ignored the plaintiff and failed to inform any supervisory staff of the injuries or amount of blood she witnessed on the plaintiff." Dkt. No. 54 at 2, ¶3.

Keefer, in contrast, attested that she did not work on August 18, 2014. Dkt. No. 49 at ¶ 6. Keefer *did* work on August 19, 2014, id., and the plaintiff himself concedes that she saw the plaintiff on rounds that day, dkt. no. 110-1 at 3. The plaintiff indicates that he explained to her "about the pain and swelling and cut on my leg [due] to excessive force by C/O Isaac, and that in response, Keefer told him to "put in a sick call slip." Dkt. No. 110-1 at 3. The plaintiff also alleges that the doctor who saw him along with Keefer said that they could not see the plaintiff unless he was having "a problem where [he was] non responsive." Id.

The plaintiff indicates that he asked a guard for a sick call slip and a pen on August 19, 2014 (after a different nurse, Nurse Alisha, saw him at 5:00 a.m. that day), but the guard denied the request. Dkt. No. 81 at 7.

Upon the plaintiff's arrival back at the Racine County Jail, a nurse was waiting for him and replaced the wraps immediately, id. at 10; he says he was treated for his injuries a day or two after that, id. at 12. The defendants provided as an exhibit a copy of the Inmate Request for Medical Attention that the plaintiff filled out at the Racine County Jail on August 19, 2014. Dkt. No. 65-1; Dkt. No. 82 at 2. The request makes no mention of any injuries; the

plaintiff stated only that Kenosha had confiscated his ACE bandages and he needed them replaced. Id.

Two days later, on August 20, 2014, the plaintiff submitted another Inmate Request for Medical Attention to the Racine County Jail. Dkt. No. 82 at 3. In this second request, he stated, "I would like to see a doctor for injuries I sustained while I was at a Kenosha County court writ. I received injuries to both knees and a large cut on my left leg. I am in great deal of pain and I've been asking since 8/18 to see medical personnel at Kenosha and Racine County Jails." Id.

Dr. Ortiz and Nurse Nicole saw the plaintiff for his injuries the next day, on August 21, 2014. Dkt. No. 82 at 1. The plaintiff says they cleaned his wounds and removed the hanging skin, and gave him ointment and gauze for the wounds. Dkt. No. 81 at 12. The medical record from this visit, however, refers only to a superficial cut approximately two inches long on the plaintiff's upper outer left leg. Dkt. No. 82 at 1.

The plaintiff submitted a third Inmate Request for Medical Attention on August 24, 2014. Dkt. No. 45-1 at 1. In this request, he said that he "want to see the doctor for the cuts I obtain on my legs that was treated on or about 8/21/14. The cut on my left leg is still painfull [sic] and has turned very red on both sides of the cut and in the middle of the cut on my left leg it's [sic] very painful." Dkt. No. 45-1 at 1.

G.     Grievance

Around September 4, 2014, the Jail received in the mail a grievance from the plaintiff, regarding an incident that allegedly occurred on August 18, 2014; the complaint did not mention anything about August 19, 2014. Dkt. No. 59-1. (The plaintiff states that in that grievance, he did not complain about any incident on August 19, 2014, because "August 19 was de minimus injuries." Dkt. No. 88 at ¶69. The grievance complained about having to give up his ACE bandages, dkt. no. 59-1 at 2; about Isaac pushing him into things in the wheelchair, id. at 2-3; about being cuffed too tightly and being treated roughly as he was removed from the wheelchair at X-Block, id. at 3; about having his medical requests ignored, id.; about being mistreated during the flooding incident, id. at 4; and about being denied bedding, id.

Corporal Parker responded to the plaintiff's grievance on September 11, 2014; he did not sustain the grievance. Dkt. No. 59-1 at 6-7. Corporal Parker stated that, as part of his investigation, he had reviewed the video footage from August 18, 2014. Id. at 6. Parker told the plaintiff that he did not observe the plaintiff being forcefully pushed into any walls or doors by the officers. Id. Nor did he observe officers trying to dump the plaintiff out of the wheelchair, although Parker stated that he *did* observe instances where it appeared the plaintiff's feet were placed in a position to stop the movement of the wheelchair. Id. According to Parker, the video footage confirmed the plaintiff being assisted to his feet by officers when arriving at X-Block and then walking through the

doorway into the cell. Id. Parker did not find any evidence to support the claim of excessive force by the officers. Id. at 7.

Parker indicated that as part of the investigation, he also spoke with the medical unit supervisor and was assured that correct procedures were followed. Id. He informed the plaintiff that the HSU at the Racine County Jail had relayed to the Jail that a wheelchair was to be provided for long distances "only because" the plaintiff walked slowly. Id.

## III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a

> genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## IV. KENOSHA DEFENDANTS

The Kenosha defendants argue that they are entitled to summary judgment. They submit: (1) the plaintiff cannot prove personal involvement by "Guard Ray," (2) the plaintiff's medical need was not objectively, sufficiently serious and substantial, (3) the defendants were not deliberately indifferent, and (4) Stauche and Isaac did not use excessive force during the plaintiff's transport to X-Block. These defendants also argue that they are entitled to qualified immunity.

### A. "Guard Ray"

The plaintiff named "Ray" as a defendant. Dkt. No. 1 at 1. He identified "Ray" as a guard at the Jail. Id. at 2. The complaint stated that during the flooding incident, after Isaac allegedly had run him into various things on the trip to X-Block, the plaintiff asked "the following guards for medical help and dry clothing and was denied," and listed "Ray" as one of those guards. Id. at 6.

In his response to the Kenosha defendants' proposed findings of fact, the plaintiff alleged that "Rhea" showed up to assist Isaac in taking him to "seg." Dkt. No. 88 at ¶27. He says that "Rhea" and Stauche—both of whom were identified for the plaintiff by other detainees housed in X-Block—walked behind

Isaac as Isaac took the plaintiff to X-block. Id. at ¶28. The plaintiff alleged that Isaac, Stauche and "Rhea" ignored his requests for medical help, and ignored "the blood and hanging skin on" the plaintiff's legs. Dkt. No. 88 at ¶43. Finally, the plaintiff alleges that on August 19, 2014, Isaac told "Rhea" to "find a spit mask." Id, at ¶41.

In their motion for summary judgment, the Kenosha defendants argued that the plaintiff never had identified "Ray." Dkt. No. 58 at 9. The defendants asserted that there was no one named "Ray" working at the Jail on August 18 or 19, 2014; they said that the only person named "Ray" who worked "in the area" was Sgt. Raymond Willstead, who was off work both of those days. Id. at 10. On this basis, the Kenosha County defendants argued that the court must dismiss the plaintiff's claims against "Ray," or "Guard Ray."

In response to the Kenosha defendants' proposed findings of fact, the plaintiff asserted that there was an officer named Ray at the Jail "who just quit in maybe August or September of 2015." Dkt. No. 88 at ¶8. The plaintiff stated that this person's name "is spelled Rhea but is pronounced by many Ray." Id.

In their reply brief in support of the motion for summary judgment (filed a few months after they filed the motion), the Kenosha defendants indicated that they'd now identified "Guard Ray" as a corrections officer named "Rea." Dkt. No. 96 at 5. They reminded the court that it had allowed the plaintiff to proceed on a claim that "Ray" was deliberately indifferent to the plaintiff's medical needs. They noted that the plaintiff had claimed that "Ray" was deliberately indifferent to his needs during the journey from the medical ward

to X-block. Id. They argued, however, that "Ray" was not involved in transporting the plaintiff from the medical ward to X-Block. Id. They also argued that, to the extent that Rea was involved with the plaintiff at all, he was standing outside the plaintiff's X-Block cell during the flooding incident, holding the plaintiff's arm. Id. at 6.

In support of the reply brief, the Kenosha defendants provided an affidavit from Steven Rea. Dkt. No. 103. Rea indicated that he was working as a second-shift correctional officer at the Jail on August 18, 2014. Id. at ¶2. Rea denied having helped transport the plaintiff from the medical ward to X-Block. Id. at 3. Both Isaac (dkt. no. 97 at ¶8) and Stauche (dkt. no. 98 at ¶7) confirmed that Rea was not part of the "transport" process. The video footage does not show Rea accompanying the group that transported the plaintiff to X-Block.

Rea _did_ indicate that he was present outside the plaintiff's X-Block cell when Burdick cleaned out the water. Dkt. No. 103 at ¶3. Rea says that he did hold on to the plaintiff's arm, for the plaintiff's safety and that of others. Id. He indicated that he was not aware that the plaintiff had any injuries or medical needs, and doesn't recall the plaintiff ever asking for medical attention or showing any medical distress. Id. at ¶4. He indicates that if an inmate does need non-emergency care, he directs the inmate to fill out a medical request form, and relays that to the nursing staff. Id. at ¶5.

The evidence does not support the plaintiff's claim that Rea was part of the group that transported him from the medical ward to X-Block. Thus, there

is no evidence to support the plaintiff's claim that, during that trip, Rea was deliberately indifferent to any medical need he might have had. While the evidence shows that Rea stood with the plaintiff outside the X-Block cell for six minutes during the flood clean-up, it does *not* show that the plaintiff was in medical distress during those six minutes; the video footage shows the plaintiff standing up without assistance during that time. There is no evidence to support the plaintiff's claim that Rea was deliberately indifferent to the plaintiff's serious medical need—only the plaintiff's bare, unsupported allegations.

In addition, as the court will discuss below, there is no evidence in the record to support the plaintiff's claim that he had a serious medical need to which any of the defendants were deliberately indifferent. The court will grant summary judgment as to defendant Steven Rea, or "Guard Ray."

      B.    <u>Deliberate Indifference to Serious Medical Need</u>

Because the plaintiff was a pretrial detainee rather than a convicted prisoner when he was at the Jail, the Fourteenth Amendment rather than the Eighth Amendment safeguards his constitutional rights. <u>Board v. Farnham</u>, 394 F.3d 469, 477-78 (7th Cir. 2005). Nevertheless, "[f]or claims of deliberate indifference, . . . [the Seventh Circuit] has found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoner) without differentiation." <u>McGee v. Adams</u>, 721 F.3d 474, 480 (7th Cir. 2013) (quoting <u>Board</u>, 394 F.3d at 478).

"[I]n order to prevail on an Eighth Amendment claim for failure to provide medical care, a plaintiff has the burden of demonstrating that '(1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety.'" Pinkston v. Madry, 440 F.3d 879, 891 (7th Cir. 2006) (citing Board, 394 F.3d at 478).

A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the need for a doctor's attention. Foelker v. Outagamie County, 394 F.3d 510, 512-13 (7th Cir. 2005) (citations omitted). Some injuries, however, "do not rise to the level of an objectively serious medical need"—such as a split lip, a swollen cheek, or "a one-inch laceration to an arrestee's temple, that was neither deep enough nor long enough to require stitches, and a scraped elbow." Pinkston, 440 F.3d at 891 (citing Davis v. Jones, 936 F.2d 971, 972-73 (7th Cir. 1991)). Injuries that do not rise to the level of an objectively serious need do not require prompt medical attention under the Eighth Amendment. Id. They are not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Pinkston, 440 F.3d at 891 (quoting Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001)).

"Deliberate indifference is more than negligence and approaches intentional wrongdoing." McGee, 721 F.3d at 480 (citations omitted). In order to establish deliberate indifference, a plaintiff "must meet essentially a criminal recklessness standard, that is, ignoring a known risk." Id. at 481. "Even gross negligence is insufficient to impose constitutional liability." Id.

### 1. *Booking*

The court first considers the plaintiff's claim that in taking away his ACE bandages during booking, Stauche was deliberately indifferent to his serious medical need. The plaintiff had a "Medical/Mental Screening" on the booking date; it indicated that "did not have any physical or behavioral conditions, only that he reported a history of gunshot wounds and that his left hip and both knees had been replaced." Dkt. No. 51 at ¶6. While the plaintiff self-reported the hip and knee replacements, however, his medical chart—which contained information about exams conducted during other incarcerations—showed no evidence that he'd had such replacements. Id. at ¶7. The August 18 Medical Questionnaire showed only that Dr. Ortiz had prescribed medications for the plaintiff at the Racine County Jail; that the plaintiff wore glasses; and that he had reported "hip problems, knee surgeries and heel spurs." Id. at ¶8.

The plaintiff himself filled out an Inmate Medical Request Form on August 18. Id. at ¶9. He asked the Jail personnel to evaluate his "walking conditions." He did not mention any injury. Id. Finally, the "Health Transfer Summaries" completed on August 18 and August 19 contain no indication that the plaintiff "sustained any injury while at the Kenosha County Jail." Id. at ¶10.

Nothing in the above records indicated, therefore, that the plaintiff had a serious medical need which required him to have ACE bandages. The plaintiff admits that he *chose* to give up the bandages so that he did not have to stay in a holding cell. Dkt. No. 81 at 4.

The plaintiff alleges that he could not walk without the "ACE wraps." Dkt. No. 88 at ¶19. (The video shows the plaintiff walking out of and into the X-Block cell, at a time when he did not have the ACE bandages, dkt. no. 70 at 14E5838; admittedly this was not a long distance.) It is not clear from the plaintiff's filings what condition he had that required him to have ACE bandages (or a wheelchair). He self-reported hip and knee replacements, but his medical chart and records do not support that report. Even if the plaintiff has had hip and knee replacements, there is no indication of when he had them, or whether they caused him pain or other problems in August 2014. He had ACE bandages (and compression socks) when he arrived at the Jail from Racine County, and he received the bandages upon his return to Racine County. But the medical records do not indicate that the bandages were medically necessary, or explain *why* the plaintiff had ACE bandages (although the plaintiff asserts that they supported his knees). There is no evidence that, at the time Stauche came into possession of the bandages, the plaintiff had a "serious medical need" that required him to have the bandages. Based on this record, the court finds that no reasonable jury could conclude that the plaintiff had an objectively serious medical need for the ACE bandages, or that Stauche was deliberately indifferent when he took them away from the plaintiff.

2.   *Injuries to Legs*

At screening, the court allowed the plaintiff to proceed on claims that Burdick and Keefer were deliberately indifferent to his serious medical needs

when they refused to seek medical care for him after Isaac allegedly injured his legs on the journey from the medical ward to the X-Block. Dkt. No. 13 at 8.

Again, the court starts by considering whether the plaintiff had an objectively serious medical need. None of the paperwork from the Jail shows any evidence that the plaintiff complained of an injury. Although he returned to the Racine County Jail on August 19, 2014, he made no allegation of any injury until August 20—a day later. The plaintiff saw Dr. Ortiz and Nurse Nicole at the Racine County Jail on August 21, 2014, three days after the events of August 18. Dkt. No. 82 at 1. They described his injury as a superficial cut approximately two inches long on the plaintiff's upper left thigh. Id. They described no blood, no skin hanging off a wound. They cleaned the cut, and gave the plaintiff antibacterial ointment (Bacitracin). Id.

A two-inch-long "superficial" cut, treatable with cleaning and some ointment, does not "rise to the level of an objectively serious medical need." Pinkston, 440 F.3d at 891. Like a split lip, a swollen cheek, a scraped elbow, or "a one-inch laceration to an arrestee's temple, that was neither deep enough nor long enough to require stitches," the plaintiff's cut did not require prompt medical attention under the Eighth Amendment. Id. Without an objectively serious medical need, the plaintiff cannot prevail on an Eighth Amendment medical care claim. Id.

Specifically with regard to defendant Megan Keefer: in his complaint, the plaintiff alleged that "Nurse Megan," along with Burdick, Stauche and two other officers, denied him medical help and dry clothing after he'd been taken

27

to X-Block. Dkt. No. 1 at 6. In his brief in support of his response to her renewed motion for summary judgment, the plaintiff says that Keefer "personally ignored" him when he asked for help, and "personally made a decision not to help" him. Dkt. No. 139-1.

The plaintiff's claim that Keefer denied him dry clothing and medical help implies that he believes Keefer violated his rights on August 18, 2014; the record refutes that claim. Keefer's affidavit attests that she did not work that day. Dkt. No. 51 at 1. Because the plaintiff has provided no proof that Keefer was present at the Jail on August 18, 2014, and because Keefer has provided proof that she was not, the evidence shows that Keefer was not personally involved in the events of August 18, 2014. "[I]ndividual liability under §1983 requires 'personal involvement in the alleged constitutional deprivation.'" Minix v. Canarecci, 597 F.3d 824, 833 (7th Cir. 2010) (quoting Palmer v. Marion Cnty., 327 F.3d 588, 594 (7th Cir. 2003)).

Even viewing the facts in the light most favorable to the plaintiff, Keefer's interaction with him on August 19, 2014 does not support his claim of deliberate indifference. The plaintiff asserts that on August 19—the day he left the Jail to return to Racine County—he told Keefer that he was in pain as a result of Isaac having subjected him to excessive force. He alleges that Keefer told him to fill out a sick call slip. Telling someone who has a superficial cut to fill out a sick call slip does not constitute deliberate indifference to a serious medical need.

The court will grant summary judgment in favor of all of the defendants on the plaintiff's Eighth Amendment claims of deliberate indifference to serious medical need.

C.   Excessive Force

The court allowed the plaintiff to proceed on a claim that Stauche and Isaac subjected him to excessive force. Because the plaintiff was a pretrial detainee at the time of the events he described in the complaint, the court analyzes his claim under the Fourteenth Amendment due process clause. See Forrest v. Prine, 620 F.3d 739, 742 (7th Cir. 2010) (citations omitted). The standard the court must apply in assessing the plaintiff's claim is "solely an objective one." Kingsley v. Hendrickson, __ U.S. __, 135 S.Ct. 2466, 2473 (2015). The court must determine whether Stauche and Isaac used force that was "objectively unreasonable." Id. at 2473. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). The court has to make its determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. Some of the facts courts consider in making this determination are

> The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. (citations omitted).

The parties here disagree about the amount of force the defendants used against the plaintiff. Isaac admits to brandishing OC spray while removing the plaintiff's handcuffs in his cell in X-Block. In contrast, the plaintiff contends that Isaac rammed his legs into numerous objects and attempted to dump the plaintiff out of his wheelchair. The plaintiff also says he was dragged out of his wheelchair and down the hall into his X-Block cell, where Isaac sat on the plaintiff while he brandished the OC spray.

Factual disputes such as these would, under other circumstances, require the court to deny summary judgment on the plaintiff's excessive force claim. The Seventh Circuit, however, faced a similar set of circumstances, and reached a different conclusion. In Boyd v. Pollard, 621 Fed. App'x 352 (7th Cir. 2015), the plaintiff had claimed that the defendants used excessive force while moving him between cells, and there was a video included in the evidence. The court affirmed the district court's grant of summary judgment in the defendants' favor, even where factual issues seemed to preclude it. In explaining why, the court stated:

> From the video, when [the plaintiff] and the guards reach the other wing of the segregation unit, we cannot tell why or how [the plaintiff] ended up on the ground and what occurred when [the plaintiff] and the guards entered his new cell. Initially it may appear as though this fact dispute would preclude summary judgment. However, summary judgment would have been improper only if a jury reasonably could find excessive force based on [the plaintiff's] assertions. We conclude that no juror who viewed the video could reasonably conclude—given the professional behavior of the guards and minor injury sustained by [the plaintiff]— that the guards, when outside the camera's view, attacked [the plaintiff]. For instance, [the plaintiff]

30

> asserts that he was bodyslammed onto a concrete floor
> and sustained numerous blows to his head and face so
> severe as to cause blood to drip down his face. But
> [the plaintiff's] injury—a small laceration above his
> eye—was minimal and cannot even be seen bleeding.
> If [the plaintiff's] account was accurate, the minor cut
> would not have been his sole injury.

Id. (citations omitted).

Like the court in Boyd, this court has the benefit of a video showing most of the trip between the medical ward and X-Block. The court cannot see what happened during the one minute the officers went into the cell in the medical ward to get the plaintiff into his wheelchair. The only claim the plaintiff makes about that period in time, however, is that when Isaac cuffed him for the trip, the cuffs were so tight that they hurt the plaintiff's wrists. Even viewing this allegation in the light most favorable to the defendant, tight handcuffs during a short wheelchair right do not constitute excessive force.

The video also does not show what happened in the thirty seconds that it took the officers to take the plaintiff into his cell on X-Block and remove the handcuffs. The video does, however, show the trip from booking to the medical ward (clip 14E5798), and the five minutes that it took to transport the plaintiff from the medical ward to his cell in X-Block (the eleven clips from 14E5802 to 14E5831). The video clips consistently show one officer pushing the plaintiff in a wheelchair; he is followed by anywhere from one to three other officers, depending on the point in the video. The plaintiff sits passively with his hands handcuffed in his lap, often staring ahead. He does not appear agitated or injured. His feet are on the floor, and his legs are covered by long pants. The

plaintiff does not reach for his knees or legs, or look to the officers behind him. Nowhere does the video show the wheelchair coming into contact with beds, tables, doors or door frames. The video does not show the plaintiff bumping into anything, or being pushed into anything. The video shows an uneventful trip from booking to medical to X-Block.

No juror who viewed the video could reasonably conclude—given the professional behavior of the guards and fact that the only confirmed "injury" the plaintiff had was a two-inch scratch on his thigh—that Isaac or Stauche, while outside the camera's view, rammed the plaintiff's leg into beds, tables, or doors, attempted to dump him from the wheelchair, slammed him into the wall, dragged him down a hall or threw him to the floor of his cell and sat on him. The court concludes, as did the <u>Boyd</u> court, that if the plaintiff's account was accurate, a single, two-inch scratch on his leg would not have been his only injury. If no juror could reasonably conclude that the defendants acted entirely differently off camera than they did on, there is no basis for the court to conclude that the officers' use of force was "objectively unreasonable." <u>Kingsley</u>, 135 S.Ct. at 2476.

The same reasoning applies to the plaintiff's claims that Isaac rammed him into things when taking him to booking on August 19. The plaintiff admits that his allegations regarding Isaac's August 19 behavior are less severe; he concedes that he did not complain about August 19 in his grievance because it "was de minimus injuries." Dkt. No. 88, ¶69. There is no evidence of "objectively unreasonable" force on August 19. <u>See</u> <u>Kingsley</u>, 135 S.Ct. at 2473.

Because the court concludes that the record evidence does not support the plaintiff's claim of excessive force, and that no jury seeing the record evidence could reasonably conclude that Stauche and Isaac subjected the plaintiff to excessive force, the court will grant summary judgment in favor of the defendants on the excessive force claim.

## IV.    CONCLUSION

The court **GRANTS** the Kenosha defendants' motion for summary judgment. Dkt. No. 57.

The court **GRANTS** defendant Megan Keefer's renewed motion for summary judgment. Dkt. No. 133.

The court **DISMISSES** this case with prejudice. The clerk of court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30** days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28** days of the entry

of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 15th day of March, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge